**PERKINS THOMPSON, P.A.**             RESPONSE TO DOCKET NO. 37
One Canal Plaza, 9th Floor
PO Box 426
Portland, ME  04112
(207) 774-2635
Randy J. Creswell, Esq.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: ) | |
| ) | |
| TRANSCARE CORPORATION, <u>et al.</u>, ) | Chapter 7 |
| ) | Case No.: 16-10407 (SMB) |
| Debtors. ) | (Jointly Administered) |
| ) | |

**RESPONSE OF PATRIARCH PARTNERS AGENCY SERVICES, LLC TO THE CHAPTER 7 TRUSTEE'S MOTION TO APPROVE STIPULATION AND FOR THE <u>PUBLIC AUCTION SALE OF CERTAIN PERSONAL PROPERTY</u>**

TO THE HONORABLE STUART M. BERNSTEIN,
UNITED STATES BANKRUPTCY JUDGE

Patriarch Partners Agency Services, LLC ("<u>PPAS</u>"), by and through its undersigned counsel, hereby files this Response to the Trustee's Motion to Sell, dated March 17, 2016 (DE 37),[1] as follows. PPAS, on behalf of itself and as the administrative agent for a number of prepetition secured lenders (collectively, "<u>Lenders</u>")[2] of Debtors,[3] supports: (i) this Court's

---

[1] *See* Motion of Chapter 7 Trustee for an Order: (I) Approving the Stipulation Respecting the Sale of Certain Personal Property; (II) Authorizing the Auction Sales of Certain Personal Property; (II) Approving the Sale and Notice Terms for the Auction Sales of Certain Personal Property; (III) Approving the Sale of Certain Personal Property, Free and Clear of All Liens, Claims and Encumbrances, Security Interests and Other Interests to the Successful Bidders at the Auction Sales; (VI) Approving the Employment of Maltz Actions as Auctioneer to Market and Publicly Auction Certain Personal Property; (V) Authorizing the Trustee to Donate or Otherwise Dispose of Certain *De Minimus* Personal Property; and (VII) Granting Related Relief, dated March 17, 2016 (the "<u>Motion to Sell</u>").

[2] Pursuant to a certain Credit Agreement, dated August 4, 2003 (and as amended) (the "<u>Credit Agreement</u>").

[3] "<u>Debtors</u>" is defined as TransCare Corporation, TC Ambulance Group, Inc., TC Ambulance North, Inc., TC Billing and Services Corp., TCBA Ambulance, Inc., TransCare Harford County, Inc., TransCare Management Services, Inc., TransCare Maryland, Inc., TransCare ML, Inc., TransCare New York, Inc., and TransCare Westchester, Inc.

approval of the Stipulation[4] attached as Exhibit A to the Motion to Sell; (ii) the Trustee's public auction sale of the Tangible Personal Property Assets pursuant to 11 U.S.C. § 363 (the "Bankruptcy Code"); and (iii) the Trustee's segregation of 10% of the Creditor Carve-Out, pursuant to the "gifting doctrine," solely for the payment of Employee Claims arising under § 507(a)(4) of the Bankruptcy Code. In support of this Response, PPAS states as follows.

## I. Background

1. On February 24, 2016 (the "Petition Date"), Debtors filed voluntary petitions for relief under the Bankruptcy Code. By Order of this Court dated March 1, 2016, Debtors case are being jointly administered.

2. Prepetition, pursuant to the Credit Agreement by and among TransCare Corporation, Lenders, and PPAS (for itself and as administrative agent for Lenders), Lenders, *inter alia*, made certain loans to Debtors.[5] From 2003 to the Petition Date, the loans made from Lenders to Debtors (and certain other non-filing affiliates of Debtors)[6] totaled approximately $46 million dollars.

3. Simultaneously with the execution of the Credit Agreement, certain Debtors entered into a Subsidiaries' Guarantee, dated as of August 4, 2003 (the "Subsidiaries' Guarantee"), in favor of PPAS and Lenders. Under the Subsidiaries' Guarantee, each of Debtors individually (with the exception of TransCare Corporation), jointly and severally guaranteed to PPAS and Lenders the payment and other obligations under the Credit Agreement.

---

[4] Capitalized terms not otherwise defined in this Response shall have the same meaning ascribed to them in the Trustee's Motion to Sell.

[5] The Credit Agreement was subsequently amended, modified, and/or superseded numerous times over a number of years to, *inter alia*, include Debtors as presently constituted.

[6] The non-filing affiliates are TC Hudson Valley Ambulance Corp., TC Ambulance Corp., and TransCare Pennsylvania, Inc.

4.  To secure the Credit Agreement and the Subsidiaries' Guarantee, Debtors entered into a Security Agreement, dated as of August 4, 2003 (the "Security Agreement"), in favor of PPAS and Lenders. Pursuant to the Security Agreement, Debtors, *inter alia*, granted to Lenders and PPAS, as administrative agent for Lenders, a security interest in certain Collateral (as that term is defined in the Security Agreement (the "Collateral")).[7]

5.  To further secure the Credit Agreement, certain Debtors entered into a Pledge Agreement, dated as of August 4, 2003 (the "Pledge Agreement"), in favor of PPAS and Lenders. Under the Pledge Agreement, each Debtor (except TransCare ML, Inc.) granted to Lenders and PPAS, for the benefit of the Lenders, a security interest in certain Pledged Collateral, including, *inter alia*, certain Pledged Stock (as such terms are defined in the Pledge Agreement).

6.  PPAS and Lenders properly perfected their security interests in the Collateral and the Pledged Stock through the filing of UCC-1 Financing Statements and related UCC-3 Amendment and Continuation Statements with the Delaware Office of the Secretary of State.[8]

7.  On October 13, 2006, Wachovia Bank, National Association, now known as Wells Fargo Bank, N.A. ("Wells Fargo"), Lenders, and PPAS (for itself and as administrative agent for Lenders), entered into a certain Intercreditor Agreement (the "Intercreditor Agreement") for the purpose of, *inter alia*, defining the relative priority of their respective security interests in

---

[7] The Collateral includes all of the following property owned or acquired at any time by Debtors or in which Debtors have any right, title or interest: all Accounts; all Bank Accounts; all Chattel Paper; all Commercial Tort Claims; all Contracts; all Copyrights; all Copyright Licenses; all Documents; all Equipment; all General Intangibles; all Instruments; all Inventory; all Investment Property; all Letter of Credit Rights; all Patents; all Patent Licenses; all Trademarks; all Trademark Licenses; all Vehicles; all books and records pertaining to the Collateral; and to the extent not otherwise included, all Proceeds and products of any and all of the foregoing.

[8] As well as in any and all products, proceeds, and insurance amounts relating thereto, and whether then owned or thereafter acquired.

the assets of Debtors by virtue of their respective loans and other financial accommodations to Debtors.

8. By way of summary only, pursuant to § 2.2 and Exhibit A to the Intercreditor Agreement, Lenders have a senior-priority perfected security interest over Wells Fargo in the following assets of Debtors: (i) machinery and equipment (including computer equipment); (ii) inventory; (iii) vehicles, trailers, trucks, cars (*i.e.*, titled vehicles); (iv) the shares of capital stock of each direct or indirect subsidiary of TransCare Corporation; (iv) intellectual property; and (v) books and records relating to any of the foregoing.[9]

9. In his Motion to Sell, the Trustee is seeking to sell the Tangible Personal Property Assets – with PPAS's consent pursuant to § 363(f)(2) of the Bankruptcy Code – in which Lenders either continue to assert and possess properly perfected, first-priority security interests, or, alternatively, own outright (*i.e.*, as possessing both legal title and equitable interest) by virtue of a strict foreclosure conducted by PPAS prepetition with regard to certain of those same assets.[10]

---

[9] *See* UCC-1 Financing Statements and related UCC-3 Amendment and Continuation Statements filed with the Delaware Office of the Secretary of State in connection with the Security Agreement against Debtors, including: TransCare New York, Inc. (UCC-1 and UCC-3 Statement Nos. 20032033556, 20082044939, 20091463204, and 20130865312); TransCare Westchester, Inc. (Nos. 20032033770, 20082045142, 20091463311, and 20130865338); TC Ambulance Group, Inc. (UCC-1 and UCC-3 Statement Nos. 20032030909, 20082045126, 20091461760, and 20130865221); TC Ambulance North, Inc. (Nos. 20032030818, 20082045084, 20091461810, and 20130865239); and TCBA Ambulance, Inc. (Nos. 20032032277, 20082045340, 20091462685, and 20130865262). *See also* UCC-1 Financing Statements and related UCC-3 Amendment and Continuation Statements filed with the Delaware Office of the Secretary of State in connection with the Security Agreement against the non-filing debtors, including: TC Hudson Valley Ambulance Corp. (Nos. 20032032384, 20082045209, 20091462511, and 20130865254) and TC Ambulance Corporation (Nos. 20032030693, 20082045050, 20091461711, and 20130865213). Each and all such Financing Statements fully and comprehensively describe the Collateral, including all General Intangibles. PPAS also properly perfected its security interests in the titled vehicles by having its lienholder status notated on the various Certificates of Title issued by the bureaus of motor vehicles in the applicable states. The Credit Agreement, the Security Agreements, the Subsidiaries' Guarantee, the Pledge Agreement, collectively, the "Loan Documents."

10. In particular, as a result of Debtors' payment and other defaults under the Loan Documents, on February 24, 2016 and prior in time to the commencement of these cases, PPAS, as administrative agent for Lenders, provided Debtors with a certain Notice of Default and Acceleration (the "Notice of Default") with respect to Debtors' debts and obligations to Lenders.

11. Subsequent to the delivery of the Notice of Default to Debtors and prior in time to the commencement of these cases, on February 24, 2016, PPAS (as administrative agent for Lenders) provided Debtors with a certain Notice of Acceptance of Subject Collateral in Partial Satisfaction of Obligation (the "Notice of Acceptance"). On that same date, and prior to the commencement of these cases, Debtors expressly agreed, in writing, to PPAS's acceptance (for the Lenders) of the collateral identified in the Notice of Acceptance in partial satisfaction of Debtors' obligations to Lenders.[11]

12. Upon Debtors' express agreement to PPAS's acceptance of the collateral identified in the Notice of Acceptance in exchange for a partial satisfaction of Debtors' obligations to Lenders, in the credited amount of $10 million dollars, PPAS's strict foreclosure under § 9-620 of the New York Uniform Commercial Code (the "NY UCC"), was complete (the "Strict Foreclosure"). *See* NY UCC § 9-620(a)(1); *see also In re CBGB Holdings, LLC*, 439 B.R. 551, 554 (Bankr. S.D.N.Y. 2010) ("Section 9–620 of the Uniform Commercial Code governs strict foreclosure—a procedure through which a secured creditor may retain its collateral in full or partial satisfaction of its claim.") (footnote and citation omitted).

---

[10] *See* NY UCC § 9-622(a) ("Effect of acceptance. A secured party's acceptance of collateral in . . . partial satisfaction of the obligation it secures: . . . (2) transfers to the secured party all of a debtor's rights in the collateral . . . ."); *see also* 11 U.S.C. § 541.

[11] PPAS has provided copies of the Notice of Default and the Notice of Acceptance to the Trustee.

13. In his Motion to Sell, the Trustee now seeks to sell the Tangible Personal Property Assets by public auction pursuant to § 363 of the Bankruptcy Code, some of which constitute assets – most notably the ambulances and other vehicles – that were the subject of the Strict Foreclosure. In particular, the Trustee disputes the validity of the Strict Foreclosure and maintains, *inter alia*, that all the Tangible Personal Property Assets are properly property of the estates and can be sold pursuant to § 363 of the Bankruptcy Code. *See also* 11 U.S.C. §§ 363(f)(4) and 541. PPAS, of course, strongly disagrees with the Trustee's position regarding the Strict Foreclosure and asserts that the Strict Foreclosure is valid

14. PPAS does agree, however, that the liquidation of the Tangible Personal Property Assets in the manner contemplated and as set forth by the Trustee in the Motion to Sell and pursuant to the parties' Stipulation is in the best interests of both Lenders and Debtors' estates. Consequently, PPAS has consented to the sale of those assets under the terms of the Stipulation, with all parties' reserving their rights to the sale proceeds (among other reservations) from the liquidation of the Tangible Personal Property Assets.

15. PPAS also asserts, for the reasons discussed below, that the Court should approve the Trustee's segregation of 10% of the Creditor Carve-Out, pursuant to the "gifting doctrine," solely for the payment of Employee Claims arising under § 507(a)(4) of the Bankruptcy Code.

## II. Discussion

16. Because the Trustee's Motion to Sell thoroughly and accurately sets forth the legal bases for the proposed public auction sale of the Tangible Personal Property Assets under the Bankruptcy Code, PPAS will not belabor the analyses here other than to state that it consents, pursuant to § 363(f)(2) of the Bankruptcy Code, to the proposed sale upon the terms and

conditions set forth in the Stipulation. If the Stipulation is approved by the Court, then PPAS asserts that the Trustee's Motion to Sell in furtherance of that Stipulation should be granted.

17. With particular respect to the Employee Wage Claim Fund (as defined in the Stipulation), PPAS asserts that the Court should approve that 10% carve-out and segregation of funds from the Creditor Carve-Out (constituting 20% of the net proceeds of sale from the Tangible Personal Property Assets) pursuant to the "gifting doctrine" as applied in this Chapter 7 case. Generally,

> [t]he Gifting Doctrine permits creditors, if they wish, to "gift" part of the distributions to which they'd otherwise be entitled to junior classes or interests, even if that gift results in unequal distributions to classes that would otherwise be *pari passu,* or if the gift makes distributions to a class when a more senior class has not been paid in full. Its rationale was explained in *SPM,* the case from which the doctrine first evolved. As the First Circuit there explained, provisions of the Bankruptcy Code governing priority of creditors "apply only to distributions of property of the estate." It continued:
>
> The Code does not govern the rights of creditors to transfer or receive nonestate property. While the debtor and the trustee are not allowed to pay nonpriority creditors ahead of priority creditors, . . . creditors are generally free to do whatever they wish with the bankruptcy dividends they receive, including to share them with other creditors.

*In re DBSD North America, Inc.*, 419 B.R. 179, 210-11 (Bankr. S.D.N.Y. 2009), *rev'd,* 634 F.3d 79, 98 (2nd Cir. 2011) (citing *In re SPM Mfg. Corp.*, 984 F.2d 1305, 1313 (1st Cir. 1993)).

18. In *DBSD North America, Inc.*, the Second Circuit found that the gifting doctrine violated the absolute priority rule and § 1129(b)(2) of the Bankruptcy Code in Chapter 11 cases and, therefore, was not viable in that context. The Second Circuit did, however, distinguish the First Circuit's *SPM* decision concerning the gifting doctrine on a number of grounds, which would appear to support the viability of the gifting doctrine in this Chapter 7 case to allow for the

Employee Wage Claim Fund carve-out from either PPAS's own property or, alternatively, its secured collateral.

> We distinguish this case from *In re SPM* on several grounds. In that case, a secured creditor and the general unsecured creditors agreed to seek liquidation of the debtor and to share the proceeds from the liquidation. . . . The bankruptcy court granted relief from the automatic stay and converted the case from Chapter 11 to a Chapter 7 liquidation. . . . The bankruptcy court refused, however, to allow the unsecured creditors to receive their share under the agreement with the secured creditor, ordering instead that the unsecured creditors' share go to a priority creditor in between those two classes. . . . The district court affirmed, but the First Circuit reversed, holding that nothing in the Code barred the secured creditors from sharing their proceeds in a Chapter 7 liquidation with unsecured creditors, even at the expense of a creditor who would otherwise take priority over those unsecured creditors.
>
> The first and most important distinction is that *In re SPM* involved Chapter 7, not Chapter 11, and thus involved a liquidation of the debtor, not a reorganization. . . . Chapter 7 does not include the rigid absolute priority rule of § 1129(b)(2)(B). *See In re Armstrong,* 432 F.3d at 514. As the First Circuit noted, "the distribution scheme" of Chapter 7 "does not come into play until all valid liens on the property are satisfied." *In re SPM,* 984 F.2d at 1312; *see* 11 U.S.C. § 726(a); *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.,* 530 U.S. 1, 5 [] (2000). *In re SPM* repeatedly emphasized the "lack[ ]" of "statutory support" for the argument against gifting in the Chapter 7 context. 984 F.2d at 1313; *see id.* at 1313–14 (finding "no support in the Code for" rejecting gifting). Under Chapter 11, in contrast, § 1129(b)(2)(B) provides clear "statutory support" to reject gifting in this case, and the distribution scheme of Chapter 11 ordinarily distributes *all* property in the estate (as it does here), including property subject to security interests, *see* 11 U.S.C. § 1129(b)(2)(A).
>
> Furthermore, the bankruptcy court in *In re SPM* had granted the secured creditor relief from the automatic stay, . . . and treated the property in question as no longer part of the estate, . . . In a very real sense, the property belonged to the secured creditor alone, and the secured creditor could do what it pleased with it. Here, however, the relevant property has remained in the estate throughout, and has never belonged to the secured creditors outright. . . . For these reasons, therefore, assuming without deciding that the First Circuit's approach was correct in the context of Chapter 7—a question not before us—we do not find it relevant to this case.

*In re DBSD North America, Inc.*, 634 F.3d at 98 (citations omitted).

19. Here, the Second Circuit's reasoning and language in *DBSD North America* suggests that the gifting doctrine should apply in this Chapter 7 case under these circumstances. First, this is a Chapter 7 liquidation case rather than a Chapter 11 reorganization, so there is no application of § 1129(b)(2) of the Bankruptcy Code in this instance, and there is no similar provision under the Bankruptcy Code in the Chapter 7 context that would preclude PPAS's gifting of a portion of its sale proceeds to the Employee Wage Claim Fund.

20. Second, if PPAS's position concerning the Strict Foreclosure is correct, then much of the Tangible Personal Property Assets is not even property of the estates, which further strongly supports PPAS's efforts and desire that the 10% carve-out for the Employee Wage Claim Fund be approved and allowed. *See In re CBGB Holdings, LLC*, 439 B.R. at 559-60 ("In any event, preferentially transferred property does not become property of the estate until it has been recovered. *See* 11 U.S.C. § 541(a)(3); *cf. FDIC v. Hirsch (In re Colonial Realty Co.),* 980 F.2d 125, 131 (2d Cir. 1992) (fraudulently transferred property does not become property of the estate until it is recovered). Even if the Assets were preferentially transferred to the Kristal Estate, the latter still owned them as of the petition date.").

21. Third, the most likely class of senior-priority unsecured creditors or claimants to the funds of the Creditor Carve Out are holders of administrative expenses claims under § 503 of the Bankruptcy Code, but the Trustee and his professionals have acquiesced (if not expressly consented) to the gifting for the benefit of the prepetition employees of Debtors, and all other administrative expenses claimants under the Bankruptcy Code should paid, in full, pursuant to the Trustee's wind-down Budget in connection with his § 721 authority.

{P1124020.1}
- 9 -

22. Fourth, it is highly unlikely that any priority unsecured claims will be filed in the case pursuant to § 507(a)(1) or (3) of the Bankruptcy Code, which, again, supports the likely lack of any prejudice to any other potentially superior class of creditors or claimants as a result of the Court's approval of the Employee Wage Claim Fund carve-out.

23. Finally, even though the administrative expense costs in this case have the potential to be extensive, it is unlikely that the Chapter 7 estate will be administratively insolvent, and so it is likely that the Employee Wage Claim Fund carve-out would have been distributed to holders of allowed § 507(a)(4) claims in any event. The carve-out, however, is nevertheless a hedge against such a potential administrative insolvency, and it serves to protect at least some funds from PPAS's collateral or property for the benefit of the Debtors' former employees.

24. For all these reasons, PPAS asserts that the gifting doctrine would be permissible and appropriate in this case, and PPAS requests that the Court approve that aspect of the parties' Stipulation.

**Conclusion**

WHEREFORE, Patriarch Partners Agency Services, LLC, on behalf of itself and as the administrative agent for Lenders, requests that the Court: (i) approve the Stipulation attached as Exhibit A to the Motion to Sell; (ii) approve the Trustee's public auction sale of the Tangible Personal Property Assets pursuant to 11 U.S.C. § 363; (iii) grant PPAS's and the Trustee's request that the Trustee be permitted to segregate 10% of the Creditor Carve-Out solely for the payment of Employee Claims arising under § 507(a)(4) of the Bankruptcy Code; and (iv) grant PPAS such other and further relief as may be appropriate under the circumstances.

Dated at Portland, Maine this 23rd day of March, 2016.

        /s/ Randy J. Creswell
        Randy J. Creswell, Esq.
        Counsel for Patriarch Partners
        Agency Services, LLC

Perkins Thompson, P.A.
One Canal Plaza, PO Box 426
Portland, ME  04112-0426
(207) 774-2635
rcreswell@perkinsthompson.com