**LaMONICA HERBST & MANISCALCO, LLP**
*Counsel to Salvatore LaMonica, as Chapter 7 Trustee*
3305 Jerusalem Avenue
Wantagh, New York 11793
Telephone: (516) 826-6500
Gary F. Herbst, Esq.
Holly R. Holecek, Esq.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x

| | |
|---|---|
| In re: | Chapter 7 |
| TRANSCARE CORPORATION, et al., | Case No.: 16-10407 (SMB) |
| | (Jointly-Administered) |
| Debtors. | |

---------------------------------------------------------------x

| | |
|---|---|
| In re: | Chapter 7 |
| TC AMBULANCE CORPORATION, | Case No.: 16-11058 (SMB) |
| Debtor. | |

---------------------------------------------------------------x

| | |
|---|---|
| In re: | Chapter 7 |
| TC HUDSON VALLEY AMBULANCE CORP., | Case No.: 16-11059 (SMB) |
| Debtor. | |

---------------------------------------------------------------x

**MOTION OF CHAPTER 7 TRUSTEE FOR: (I) AN ORDER: (A) APPROVING TERMS AND CONDITIONS OF SALE BETWEEN THE TRUSTEE AND MALER GROUP LLC; (B) APPROVING A BREAK-UP FEE; (C) APPROVING COMPETING TERMS AND CONDITIONS OF SALE; (D) APPROVING A CARVE-OUT FROM SECURED LIENS FOR THE BENEFIT OF THE DEBTORS' ESTATES; (E) SCHEDULING THE TIME, DATE AND PLACE FOR THE SOLICITATION OF HIGHER OR BETTER OFFERS; (F) APPROVING THE FORM AND MANNER OF NOTICE OF SALE; AND (G) SCHEDULING A HEARING TO CONFIRM THE RESULTS OF THE SALE; AND (II) AN ORDER: (A) APPROVING THE SALE OF THE DEBTORS' AMBULANCE SERVICE CERTIFICATES ISSUED BY THE NEW YORK STATE DEPARTMENT OF HEALTH FREE AND CLEAR OF ALL LIENS, CLAIMS AND ENCUMBRANCES; AND (B) GRANTING RELATED RELIEF**

TO THE HONORABLE STUART M. BERNSTEIN,
UNITED STATES BANKRUPTCY JUDGE

Salvatore LaMonica, as Chapter 7 Trustee (the "<u>Trustee</u>") for the jointly-administered estates of TransCare Corporation, <u>et al</u>. (the "<u>Initial Debtors</u>") and as interim Chapter 7 Trustee of TC Ambulance Corporation and TC Hudson Valley Ambulance Corp. (the "<u>Additional Debtors</u>" and, together with the Initial Debtors, the "<u>Debtors</u>"), by his counsel, LaMonica Herbst & Maniscalco, LLP, submits this motion (the "<u>Motion</u>") seeking entry of: (I) an order, substantially in the form annexed as **<u>Exhibit A</u>** (the "<u>Sale Procedures Order</u>"): (a) approving the Terms and Conditions of Sale between the Trustee and Maler Group LLC ("<u>Maler Group</u>") for all right, title and interest of the Debtors and the Trustee in, to and under the CONs (as defined herein), subject to higher or better offers that may be tendered to the Trustee at a sale (the "<u>CONs Sale</u>"), a copy of which is annexed as **<u>Exhibit B</u>** (the "<u>Sale Terms</u>"); (b) approving a break-up fee to Maler Group; (c) approving the Competing Terms and Conditions of Sale that will govern the solicitation of competing offers for the CONs at the CONS Sale, a copy of which is annexed as **<u>Exhibit C</u>** (the "<u>Competing Sale Terms</u>"); (d) approving the Carve-Out (as defined herein) from the proceeds of the sale of the CONs from the secured liens of Wells Fargo Bank, N.A. ("<u>Wells Fargo</u>") and Patriarch Partners Agency Services LLC (on behalf of itself and as Administrative Agent) ("<u>PPAS</u>"), and any alleged interest of Transcendence Transit, Inc. ("<u>Transcendence</u>") for the benefit of the Debtors' estates; (e) scheduling the time, date and place for CONs Sale; (f) approving the form and manner of notice of the CONs Sale, a copy of which is annexed as **<u>Exhibit D</u>** (the "<u>Notice of Sale</u>"); and (g) scheduling a hearing to confirm the results of the CONs Sale; and (II) an order (in a form to be submitted following the CONs Sale) (the "<u>Sale Approval Order</u>"): (a) approving the sale of the CONs, free and clear of all liens,

claims and encumbrances; and (b) approving and granting such other, further and different relief as this Court deems just and proper, and respectfully states as follows:

## **PRELIMINARY STATEMENT**

1.  By this Motion, the Trustee seeks authorization to, <u>inter alia</u>, proceed with the sale and transfer of the CONs in accordance with Local Bankruptcy Rule 6004-1 and General Order M-383 dated November 18, 2009 adopting the Amended Guidelines for the Conduct of Asset Sales (the "<u>M-383 Order</u>").

2.  The Debtors are not operating and the CONs are valuable assets that can be liquidated for the benefit of the Debtors' estates and their creditors. After soliciting and reviewing multiple offers for the CONs, the Trustee accepted the offer from Maler Group, subject to higher or better offers that may be tendered at the CONs Sale and Court approval.

3.  The Trustee intends to solicit higher or better offers for the CONs at the CONs Sale, which the Trustee proposes be scheduled for <u>Tuesday, June 28, 2016 at 2:00 p.m.</u> at the Court. The Trustee proposes that the hearing to confirm the results of the CONs Sale be scheduled for <u>Wednesday, July 6, 2016 at 10:00 a.m.</u> at the Court (the "<u>Sale Approval Hearing</u>").

4.  Wells Fargo has senior secured, first-priority, perfected and unavoidable liens against the CONs. PPAS asserts second-priority liens against the CONs and Transcendence asserts an alleged interest in the Additional Debtors CONs. As reflected in the proposed Sale Procedures Order annexed as **Exhibit A**, Wells Fargo has consented to the CONs Sale and agreed to a carve-out from its secured liens for the benefit of the Debtors' estates. The proposed agreement with Wells Fargo provides a mechanism for the liquidation of the CONs, a sharing of the expenses associated with the preservation, sale and transfer of the CONs and a division of the net sale proceeds. By virtue of Wells Fargo's consent, PPAS is deemed to have consented to the CONs Sale as a second-priority lien holder. Moreover, PPAS and Transcendence previously

consented to the sale of the CONs by the Trustee free and clear of their liens and/or alleged interests.

5.      For these and the reasons set forth below, the Trustee respectfully requests that the Court approve the Motion.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

7.      Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

8.      The statutory predicates for the relief sought in this Motion include 11 U.S.C. §§ 105, 327, 328, 330, 331, 363, 364 and 506 (the "Bankruptcy Code"), Rules 2002 and 6004(h) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Local Bankruptcy Rule 6004-1.

## BACKGROUND

**A.      The Bankruptcy Cases**

9.      On February 24, 2016 (the "Initial Petition Date"), the Initial Debtors each filed voluntary petitions for relief under Chapter 7 of the Bankruptcy Code in this Court.

10.      On February 25, 2016, Salvatore LaMonica was appointed as the interim Chapter 7 Trustee of the Initial Debtors' cases and, by operation of law, Salvatore LaMonica is the Chapter 7 Trustee of the Initial Debtors' estates.

11.      Pursuant to Orders dated March 1, 2016, the Initial Debtors' cases are being jointly administered under case no. 16-10407 (TransCare Corporation).

12.      By Notice of Appointment of Patient Care Ombudsman dated April 1, 2016, Lucy L. Thompson was appointed as the Patient Care Ombudsman in the Initial Debtors' cases (the "PCO"). See Case No. 16-10407, Dkt. No. 60.

13.　　On April 25, 2016 (the "Additional Petition Date" and, together with the Initial Petition Date, the "Petition Dates"), the Additional Debtors each filed voluntary petitions for relief under Chapter 7 of the Bankruptcy Code in this Court.

14.　　Salvatore LaMonica was appointed as the interim Chapter 7 Trustee of the Debtors' cases and is currently acting in that capacity.

15.　　By Order dated March 25, 2016 (the "721 Order") [Dkt. No. 51], as extended by Order dated April 29, 2016 [Dkt. No. 125], the Trustee was authorized to, inter alia, operate and/or designate an operator to maintain the CONs and to pay reasonable and necessary expenses required in connection therewith for an interim period, nunc pro tunc to February 25, 2016.

**B.　　The CONs**

16.　　Initial Debtor TransCare Corporation is the 100% owner, either directly or indirectly, of the Additional Debtors. It is the Trustee's understanding that, prior to the Petition Dates, all of the Debtors operated as an integrated entity under TransCare Corporation.

17.　　Prior to their respective Petition Dates, the Debtors' business was to provide emergency medical transportation services to hospitals and communities in New York, including 911/EMS services, basic life support, advanced life support, critical care transport, ambulette and wheelchair van and special venue transportation services. The Debtors also provided non-emergency response services and critical care transfers to and between health care facilities, hospitals, nursing homes and other specialty care facilities.

18.　　The Initial Debtors were operating in accordance with five (5) Ambulance Service Certificates issued by the New York State Department of Health and identified as follows: (i) no. 0164 issued to debtor TransCare New York, Inc. d/b/a TransCare for Bronx, Kings, Nassau, New York, Queens, Richmond, Suffolk and Westchester counties; (ii) no. 0470 issued to debtor TransCare Westchester, Inc. for Westchester county; (iii) no. 0508 issued to debtor TC

Ambulance Group, Inc., d/b/a Mount Sinai Beth Israel for Kings, Queens, Richmond, Bronx, New York counties; (iv) no. 0509 issued to debtor TC Ambulance North, Inc., d/b/a TransCare for Bronx, New York, Queens, Kings and Richmond counties; and (v) no. 0574 issued to TCBA Ambulance, Inc., d/b/a St. Barnabas Hospital Emergency Services for Bronx, Kings, New York, Queens and Richmond counties (collectively, the "Initial Debtors' CONs").

19.     The Additional Debtors were operating in accordance with two (2) Ambulance Service Certificates issued by the New York State Department of Health and identified as follows: (i) no. 0667 issued to non-debtor TC Hudson Valley Ambulance Corp., d/b/a TransCare for Rockland, Orange, Ulster, Sullivan, Dutchess, Putnam, Westchester and Delaware counties; and (ii) no. 0510 issued to non-debtor TC Ambulance Corp., d/b/a Metro EMS for Bronx, New York, Queens, Kings, Richmond and Westchester counties (together, "Additional Debtors' CONs" and, together with the Initial Debtors' CONs, the "CONs").

20.     The CONs must be preserved in order maintain their transferability. Specifically, Article 30, section 3010(4) of the Public Health Law of New York State provides as follows:

> No ambulance service certificate of an ambulance service which has discontinued operations for a continuous period in excess of thirty days shall be transferable without the approval of the appropriate regional council.

NY Pub Health § 3010(4).

21.     In accordance with the 721 Order, the Trustee has taken all steps necessary to preserve and maintain the CONs. The Trustee entered into a services agreement with SeniorCare EMS Inc., d/b/a SeniorCare ("SeniorCare"). Pursuant to the services agreement, SeniorCare, a licensed ambulance operator in New York State, agreed to operate certain ambulances of the Debtors under the CONs a minimum of one call every thirty days within the designated license area. Pursuant to the services agreement, each of the vehicles must be insured by the Debtors' estates and the Debtors' estates are responsible for certain out-of-pocket costs and expenses

incurred by SeniorCare to maintain and stock the vehicles. The CONs were each operated in March 2016 and April 2016 in accordance with the services agreement and the 721 Order.

**C.**     **Secured Indebtedness On The CONs And The Carve-Out**

22.     Wells Fargo asserts senior secured, first-priority perfected and unavoidable liens against the CONs. PPAS asserts second priority liens against the CONs and Transcendence asserts an alleged interest in the Additional Debtors CONs.

23.     As reflected in the proposed Sale Procedures Order (**Exhibit A** hereto), Wells Fargo has consented to the Trustee's sale of the CONs in accordance with the Sale Terms and the Competing Sale Terms and agreed to a carve-out from the proceeds of the sale of the CONs for the Debtors' estates (the "Carve-Out"). See **Exhibit A** at 7, ¶ 12. The Carve-Out includes, inter alia, the expenses incurred in connection with the preservation, protection and sale of the CONs, the Break-Up Fee, 18.18% of the Maler Group offer (less certain expenses) and 20% of any sums in excess of the Maler Group offer. See id. As a second-priority lien holder, PPAS is deemed to have consented to the proposed sale by virtue of Wells Fargo's consent.

24.     Pursuant to an Order dated March 25, 2016 [Case No. 16-10407, Dkt. No. 52], the Court approved, inter alia, a stipulation between the Trustee, PPAS and Transcendence providing that inter alia, that PPAS and Transcendence consent to the Trustee's sale of the CONs free and clear of any and all of their liens and/or interests.

**D.**     **The Sale Terms**

25.     The Trustee and his counsel engaged in extensive communications with interested parties and considered numerous offers for the CONs. To date, Maler Group's offer is the highest and best offer received by the Trustee for the CONs. After arm's-length negotiations, the Trustee and Maler Group entered into the Sale Terms annexed as **Exhibit B**. Wells Fargo reviewed and approved the Sale Terms prior to execution by Maler Group.

26.     Pursuant to the Sale Terms, Maler Group has agreed to purchase the CONs for three million dollars ($3,000,000.00), subject to Court approval and higher or better offers that may be tendered to the Trustee at the CONs Sale. <u>See</u> **Exhibit B** at 2, ¶ 1. In accordance with the Sale Terms, Maler Group paid an initial deposit of one hundred and fifty thousand dollars ($150,000.00) to the Trustee. The Sale Terms provide for an additional deposit of one hundred and fifty thousand dollars ($150,000.00) two (2) business days after entry of the Sale Procedures Order. <u>See</u> <u>id</u>. at ¶ 2.

27.     The Sale Terms provide that the CONs are being transferred and sold "as is", "where is", "with all faults," without any representations, covenants, guarantees or warranties of any kind or nature whatsoever, and free and clear of any and all liens, claims, encumbrances, interests or adverse claims to title, of whatever kind or nature (collectively, the "<u>Liens</u>"). <u>See</u> **Exhibit B** at 2, ¶ 3.

28.     The Sale Terms provide that, if Maler Group is the highest and best offeror for the CONs, the payment of the balance of the purchase price must be paid to the Trustee no later than two (2) business days after entry of the Sale Approval Order, provided there is no stay of the Sale Approval Order. <u>See</u> **Exhibit B** at 4, ¶ 5.

29.     The Sale Terms provide that, if the CONs are transferred to any person or entity other than Maler Group (the "<u>Non-Maler Group Successful Bidder</u>"), then Maler Group is entitled to a break-up fee in the total amount of ninety thousand dollars ($90,000.00) (the "<u>Break-Up Fee</u>"). <u>See</u> **Exhibit B** at 3, ¶ 4 (a)(v). Pursuant to the Sale Terms, the Break-Up Fee is payable upon Article 30 approval of the transfer of the CONs to the Non-Maler Group Successful Bidder. <u>See</u> <u>id</u>. at 4, ¶ 4 (c)(iii).

30.     The Sale Terms provide that the sale and transfer of the CONs is contingent upon approval and transfer of the CONs in their entirety to Maler Group by the New York State

Department of Health and the applicable Regional Emergency Medical Services Council in accordance with Article 30 of the Public Health Law (the "Article 30 Approval"). See **Exhibit B** at 5, ¶ 9. Pursuant to the Sale Terms, Maler Group has agreed to act in good faith, to make commercially reasonable efforts and to promptly take all steps necessary to obtain Article 30 Approval. See id. at ¶ 10.

31.     The above is a summary of the salient terms and conditions of the Sale Terms. The Court and all interested parties are respectfully referred to the Sale Terms annexed as **Exhibit B** for their precise terms and conditions.

**E.     The Competing Sale Terms**

32.     Annexed as **Exhibit C** are the Competing Sale Terms that will govern the solicitation of higher or better offers for the CONs at the CONs Sale. Wells Fargo reviewed the Competing Sale Terms and approved their form.

33.     The Competing Sale Terms provide as follows:

> The CONs will be offered at the CONs Sale in bulk and individually until such time as the Trustee, in his discretion and in conjunction with Wells Fargo, determines the highest or best offer (or offers) for the CONs but not until the conclusion of all bidding whatsoever.

  a.  To bid on all seven (7) CONs at the CONs Sale, a Competing Offer must agree to pay not less than three million one hundred and fifty thousand dollars ($3,150,000.00) for the CONs (a "Competing Bulk Bid").

   i.  A Competing Offeror making a Competing Bulk Bid must deliver to the Trustee, by 12:00 p.m. on the day prior to the CONs Sale (i.e., by 12:00 p.m. on _____ ___, 2016), a certified check made payable to "Salvatore LaMonica, as Trustee" in the amount of three hundred and fifteen thousand dollars ($315,000.00) (the "Competing Bulk Deposit").

   ii.  Any bulk bids for the CONs following the Competing Bulk Bid shall be a minimum of $25,000 higher than the previous bid.

  b.  At the CONs Sale, the Trustee will consider all bids for individual CONs, including combinations of certain CONs but less than all seven (7) (each, a "Competing Individual Bid").

> i. A Competing Offeror making a Competing Individual Bid must deliver to the Trustee, by 12:00 p.m. on the day prior to the CONs Sale (i.e., by 12:00 p.m. on _____ ___, 2016), a certified check made payable to "Salvatore LaMonica, as Trustee" in the amount of one hundred thousand dollars ($100,000.00) per CON (the "Competing Individual Deposit").

> c. Except as set forth in the Competing Sale Terms, all bidding for individual CONs at the CONs Sale will be in increments to be determined by the Trustee, his professionals and Wells Fargo.

See **Exhibit C** at 2-3, ¶ 1.

34. The Competing Sale Terms disclose that Maler Group is a qualified bidder for individual CONs or bulk bid of all CONs at the CONs Sale and that the Maler Group is permitted to use the Break-Up Fee with any bid it submits at the CONs Sale. See **Exhibit C** at 3, ¶ 1.

35. The remaining Competing Sale Terms otherwise substantially mirror the Sale Terms insofar as they provide for, inter alia, payment of the balance of the Successful Purchase Price (as defined in the Competing Sale Terms) within two (2) business days from the entry of the Sale Approval Order, that the CONs will be sold and transferred free and clear of all Liens by a Bill of Sale and the sale and transfer of the CONs is contingent upon Article 30 Approval. See, generally, **Exhibit C**.

36. The above is a summary of the salient terms and conditions of the Competing Sale Terms. The Court and all interested parties are respectfully referred to the Competing Sale Terms annexed as **Exhibit C** for their precise terms and conditions.

## F.    **The Break-Up Fee**

37. In consideration for Maler Group having expended time and expenses in connection with the Sale Terms and the CONs Sale, the Sale Terms provide, subject to Court approval, for a Break-Up Fee to Maler Group in the event the CONs are sold and transferred to a

Non-Maler Group Successful Bidder. Pursuant to the Sale Terms, the Break-Up Fee is payable after the Non-Maler Group Successful Bidder obtains Article 30 Approval.

38. The Trustee represents that: (a) approval of the Break-Up Fee is an integral part of the Sale Terms; (b) in the absence of the Break-Up Fee, Maler Group would not have entered into the Sale Terms; (c) the Sale Terms are necessary and beneficial to the Debtors' estates; and (d) the Break-Up Fee is reasonable in relating to Maler Group's efforts and to the magnitude of the transaction contemplated by the Sale Terms.

## RELIEF REQUESTED AND BASIS FOR RELIEF

39. By this Motion, the Trustee seeks: (a) entry of the Sale Procedures Order (**Exhibit A** hereto): (i) approving the Sale Terms (**Exhibit B** hereto); (ii) approving the Break-Up Fee; (iii) approving the Competing Sale Terms (**Exhibit C** hereto); (iv) approving the Carve-Out; (v) scheduling the time, date and place for CONs Sale; (vi) approving the Notice of Sale (**Exhibit D** hereto); and (vii) scheduling a hearing to confirm the results of the CONs Sale; and (b) entry of the Sale Approval Order (in a form to be submitted following the CONs Sale): (i) authorizing and approving the sale of the CONs, free and clear of all Liens; and (ii) approving and granting such other, further and different relief as this Court deems just and proper.

40. The sale and transfer of the CONs now is appropriate and necessary. The Debtors are not operating and the CONs are valuable assets that can be liquidated for the benefit of the Debtors' estates and their creditors. The proposed CONs Sale will ensure that the value of the CONs is maximized and that the highest or best offer(s) for the CONs is received.

## I.     The Entry of the Sale Procedures Order Is Appropriate And Necessary

41. In accordance with the M-383 Order, the proposed Sale Procedures Order (the form of which has been agreed to by Maler Group and Wells Fargo) sets forth the terms and conditions of the solicitation of higher or better offers for the CONs at the CONs Sale, including

the Break-Up Fee for Maler Group, the stalking horse bidder. For the reasons set forth more fully below, the Sale Procedures Order merits approval.

### A.    **The Sale Terms Should Be Approved**

42.    As set forth above, the Trustee received multiple offers for the CONs from potential buyers. Following arm's-length negotiations, and after considering all relevant issues, the Trustee determined that Maler Group's offer was the highest and best offer received. The Trustee and Maler Group have agreed to the sale and transfer of the CONs upon the terms and conditions set forth in the Sale Terms (**Exhibit B** hereto).

43.    The Trustee believes that the Sale Terms are fair and reasonable and in the best interests of the Debtors' estates, creditors and other parties in interest. Notwithstanding, the Sale Terms expressly provide that the proposed sale and transfer of the CONs will be tested by the solicitation process and CONs Sale during which higher or better offers will be considered.

44.    The Trustee submits that the Sale Terms are reasonably designed to ensure that the Debtors' estates receive the maximum benefit available from the CONs and therefore warrant Court approval.

### B.    **The Break-Up Fee Should Be Approved**

45.    The Trustee requests approval of the provisions of the Sale Terms regarding the Break-Up Fee to Maler Group in the total amount of ninety thousand dollars ($90,000.00) (i.e., 3% of Maler Group's offer). The Break-Up Fee is only due upon the sale and transfer of the CONs to a Non-Maler Group Successful Bidder and payable following Article 30 Approval to a Non-Maler Group Successful Bidder.

46.    As noted above, approval of the Break-Up Fee is an integral part of the Sale Terms, in the absence of which Maler Group would not have entered into the Sale Terms. The Trustee submits that the Break-Up Fee is reasonable in relation to Maler Group's efforts and the

magnitude of the transaction contemplated by the Sale Terms. Further, Maler Group's offer establishes an appropriate floor value for the CONs after diligent and protracted discussions with numerous potentially interest bidders.

47. Bankruptcy Courts have approved bidding incentives similar to the Break-Up Fee under the "business judgment rule," and such arrangements are presumptively valid provided that: (a) the decision to agree to the break-up fee is not tainted by bad faith or self-dealing; (b) the break-up fee does not hamper bidding; and (c) the amount of the break-up fee is reasonable. See Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.), 147 B.R. 650, 656-657 (S.D.N.Y. 1992), appeal dismissed, 3 F.3d 49 (2d Cir. 1993). A break-up fee serves as an "incentive payment" offered to an unsuccessful bidder who places the debtor's property in a "sales configuration mode," thereby attracting other bidders to the auction. Specifically, break-up fees: (a) attract or retain a potentially successful bid; (b) establish a bid standard or minimum for other bidders to follow; and (c) attract additional bidders. Integrated Res., 147 B.R. at 661-62.

48. Here, the Break-Up Fee is the product of good faith, arm's-length negotiations between the Trustee and Maler Group, each of whom is represented by counsel. The Break-Up Fee provides a material benefit to the estates by enabling the Trustee to obtain the commitment from Maler Group, which has expended money, time and effort formulating and negotiating, inter alia, the offer for the CONs and the Sale Terms. In the Trustee's business judgment, the Break-Up Fee is fair and reasonable when considering the time, effort, costs and expense that Maler Group has incurred in negotiating the Sale Terms.

49. The Break-Up Fee does not hamper any other party's ability to offer a higher or better bid for the CONs, which will be offered for sale in bulk and individually at the CONs Sale. Given the size of the Break-Up Fee relative to the total amount of consideration provided for the

CONs pursuant to the Sale Terms, and relative to the "overbid" requirements set forth in the Competing Sale Terms, the fee is not so large as to have a "chilling effect" on other prospective bidders' interest in the CONs. Because the Sale Terms have created a floor for additional bids, the Maler Group has provided significant value to the Debtors' estates.

50.     Moreover, the Break-Up Fee is reasonable in relation to the size of the proposed sale and under the facts and uncertainties of this transaction. The Break-Up Fee is limited to 3% of Maler Group's $3,000,000.00 offer, i.e., $90,000.00. The Break-Up Fee is reasonably similar to break-up fees approved in other bankruptcy cases. See, e.g., In re Cabrini Med. Ctr., Case No. 09-14398 (ALG) (Bankr. S.D.N.Y. Dec. 30, 2009 (approving a break-up fee of 3.75% for an $80 million sale); In re Saint Vincent Catholic Medical Center, et al., Case No. 10-11963 (Bankr. S.D.N.Y. June 30, 2011) (approving a break-up fee of 2% on a $34 million sale of assets); In re Bearingpoint, Inc., No. 09-10691 (REG) (Bankr. S.D.N.Y. Apr. 7, 2009) (approving a break-up fee of 2% on a $1 billion sale); In re Adelphia Bus. Solutions, Inc., No. 02-11389 (REG) (Bankr. S.D.N.Y. Dec. 16, 2002) (approving a termination fee of 2.5% on a $10.7 million sale).

51.     Equally as important, the Break-Up Fee will be paid from the Carve-Out of Wells Fargo's senior secured first-priority liens.

52.     The Trustee submits that the Break-Up Fee is appropriate under these circumstances and warrants Court approval.

**C.     The Competing Sale Terms Should Be Approved**

53.     The Competing Sale Terms (**Exhibit C** hereto), which the Maler Group and Wells Fargo have approved, will ensure that the Debtors' estates receive the greatest benefit available from the sale of the CONs. The Competing Sale Terms have been structured to attract Competing Offerors to the CONs Sale while allowing the Trustee, in consultation with Wells Fargo, to select the bid or bids that provide the greatest overall value to the Debtors' estates.

14

54.     The Trustee submits that the Competing Sale Terms are reasonably designed to ensure that the Debtors' estates receive the maximum benefit available from the sale and transfer of the CONS and therefore warrant Court approval.

**D.     The Notice of Sale Should Be Approved**

55.     Pursuant to Bankruptcy Rules 2002(c) and 6004(a), the Trustee is required to give twenty-one (21) days' notice of any proposed sale of property not in the ordinary course of business to the Debtors and all creditors. See FED. R. BANKR. P. 2002(c) and 6004(a). Bankruptcy Rule 2002(c) provides that such notice must include the time and place of any auction, a sale hearing, and the time fixed for objections to the sale. See FED. R. BANKR. P. 2002(c). The M-383 Order provides that the statutory notice period should not be shortened for notice of the actual sale without a showing of good cause. See M-383 Order at 14, ¶ 2.

56.     Here, the Trustee proposes to serve a Notice of Sale, substantially in the form annexed as **Exhibit D**, not less than twenty-one (21) days prior to the CONs Sale (i.e., by May 31, 2016) upon the following parties: (a) all parties identified by the Trustee as potentially having an interest in acquiring some or all of the CONs; (b) the United States Trustee (Southern District of New York); (c) all parties in interest who have requested notice pursuant to Bankruptcy Rule 2002; (d) the following state and local taxing and regulatory authorities: (i) the New York State Department of Health; (ii) the applicable Regional Emergency Medical Services Council; (iii) the United States Attorney for the Southern District of New York; (iv) the Attorney General of the State of New York; and (v) Corporation Counsel of the New York City Department of Finance; (e) counsel to Maler Group; (f) the PCO; (g) Wells Fargo, PPAS and Transcendence, through counsel, and all other parties who are known to assert a lien or interest

in the CONs (if any); and (h) all creditors who have filed proofs of claim against the Debtors' estates[1] (collectively, the "Notice Parties").

57.     As reflected in the proposed Notice of Sale, it will advise the Notice Parties of the following: (a) the date, time and location of the CONs Sale; (b) the Competing Sale Terms, including that the sale will be free and clear of all Liens; and (c) a reasonably specific description of the CONs. On or before May 31, 2016, notice of the CONs Sale will also be published in *The New York Times*.

58.     The Trustee submits that the Notice of Sale as proposed substantially complies with Bankruptcy Rule 2002 and the M-383 Order, and constitutes good and adequate notice of the CONs Sale. Therefore, the Trustee respectfully requests that the Court approve the proposed Notice of Sale.

### E.     The Sale Approval Hearing

59.     The Trustee proposes that, following the CONs Sale, an affirmation to confirm the results of the sale will be submitted to the Court along with the proposed Sale Approval Order authorizing and approving, inter alia, the Trustee's sale and transfer of the CONs to the successful bidder (or bidders) from the CONs Sale.

60.     The Trustee proposes that the Sale Approval Hearing will be conducted on July 6, 2016.

---

[1]     The Initial Debtors have filed a Consolidated List of Creditors/Master Mailing Matrix (the "Matrix") but have not filed any schedules. See, e.g., Case No. 16-10407, Dkt. No. 5. The creditor matrix filed in the Additional Debtors' cases mirrors the Matrix. Counsel to the Trustee previously conferred with the Initial Debtors' counsel who indicated that every entity that appeared in the Debtors' accounts payable system was included on the Matrix. Debtors' counsel further indicated that, because they could not determine which entities were owed money from the Debtors, all parties were included for noticing purposes. Given the amount of parties listed on the Matrix (approximately 4,000) and the Initial Debtors' counsel's representations (and subject to Court approval), the Trustee does not intend to serve Notices on every party listed on the Matrix.

## II.    The Sale Approval Order Should Be Entered

61.    By this Motion, the Trustee also seeks entry of the Sale Approval Order following the hearing to confirm the results of the CONs Sale. As set forth above, the Trustee intends to submit an affirmation confirming the results of the CONs Sale and the proposed Sale Approval Order prior to the Sale Approval Hearing.

### A.    The Sale And Transfer Of The CONs Represents A Reasonable Exercise Of The Trustee's Business Judgment And Should Be Approved

62.    Bankruptcy Code § 363 provides, in relevant part, that "[t]he trustee, after notice and hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate . . . ." 11 U.S.C. § 363(b)(1). The terms of such sale is generally within the sound discretion of the debtor, or if applicable the trustee. See Committee of Equity Security Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1071 (2d Cir. 1983); see also Official Comm. of Unsecured Creditors of LTV Aerospace & Defense Co. v. LTV Corp. (In re Chateaugay Corp.), 973 F.2d 141, 145 (2d Cir. 1993); In re Dial-A-Mattress Operating Corp., 2009 Bankr. LEXIS 1801, at *12 (Bankr. E.D.N.Y. June 24, 2009) ("The business judgment test is the standard for Section 363 sales in this Circuit." (citations omitted)); In re Hirsch, 360 B.R. 43, 45–46, 48, 50 (Bankr. E.D.N.Y. 2007) (requiring "existence of 'a good business reason to grant such an application'" (quoting In re Lionel Corp., 722 F.2d at 1071)); In re Thomson McKinnon Sec., Inc., 120 B.R. 301, 307–08 (Bankr. S.D.N.Y. 1990). As recognized by the United States Court of Appeals for the Second Circuit in Lionel Corp., a court may approve a § 363 application after expressly determining from the evidence presented that a good business reason exists to grant such application. 722 F.2d 1063.

63.    In addition, § 105(a) of the Bankruptcy Code grants the Court the authority to "issue any order, process or judgment that is necessary or appropriate to carry out the provisions

of [the Bankruptcy Code]." 11 U.S.C. § 105(a). This provision is "the basis for a broad exercise of power [by the Court] in the administration of a bankruptcy case. 2 COLLIER ON BANKRUPTCY ¶ 105.01 (Alan N. Resnick and Henry J. Sommer. eds., 16th ed.).

64.     In accordance with Bankruptcy Rule 6004(f)(1), sales of property outside of the ordinary course of business may be by private sale or by public sale. In practice, the preferred method is to conduct a public sale because a public sale will most often result in a greater number of potential bidders in the shortest amount of time. That is, in order to determine that a private sale has yielded the highest or best offer, property generally must remain on the market for a significantly longer period of time than when offered at a public sale.

65.     Local Rule 6004-1(a) further provides that:

> The trustee may sell property of the estate that the trustee reasonably believes has an aggregate gross value of no more than $10,000 by public or private sale on seven days' written notice to any party with an interest in such property, the landlord of the premises on which the property is located, and such other parties as the Court may direct. The notice of any proposed sale of property of the estate having an aggregate gross value of at least $2,500 shall include the time and place of the proposed sale, whether the sale will be public or private, and the terms and conditions of the proposed sale.

66.     The M-383 Order supplements the requirements of Bankruptcy Code § 363, Bankruptcy Rule 6004 and Local Rule 6004-1 and provides, in pertinent part, that:

> When an auction is contemplated, the [Trustee] should file a single motion seeking the entry of two orders to be considered at two separate hearings. The first order . . . will approve procedures for the sale process, including any protections for an initial bidder, or stalking horse buyer, and the second order . . . will approve the sale to the successful bidder at the auction.

See M-383 Order at 2.

67.     Here, the Trustee determined, in his sound business judgment, that selling the CONs outside the ordinary course of business pursuant to the Sale Terms and the Competing Sale Terms at the CONs Sale is justified, necessary and appropriate. Given that the Debtors are

no longer operating and that the CONs are not necessary for any reorganization, the prudent course is to proceed with their immediate sale and transfer. Indeed, compelling business justifications exist for the approval of the Sale Terms, the Competing Sale Terms and the CONs Sale as set forth herein.

68.     Based upon the foregoing, the Trustee submits that the proposed sale and transfer of the CONs represents a reasonable exercise of the Trustee's business judgment and should be approved.

**B.     The CONs Should Be Sold Free And Clear Of All Liens**

69.     Bankruptcy Code § 363 permits the sale of assets to be free and clear of liens, claims and interests of an entity in such property if: (a) applicable state law will permit the sale; (b) such entity consents; (c) the price at which the assets is being sold exceeds the liens, claims and interests; (d) the security interest in the property is disputed; or (e) the entity with an interest in the asset being sold could be compelled in a legal or equitable proceeding to accept a money satisfaction of its interest in and to the property. See 11 U.S.C. § 363(f).

70.     Here, as reflected in the Sale Procedures Order, Wells Fargo has consented to the sale of the CONs free and clear of its senior secured, first-priority liens. Moreover, PPAS and Transcendence already consented to the Trustee's sale of the CONs free and clear of their liens and/or interests. See Case No. 16-10407, Dkt. No. 52.

71.     Based on the foregoing, the requirements of Bankruptcy Code § 363(f) are satisfied.

### C.   Maler Group Should Be Afforded Protection Under Bankruptcy Code § 363(m)

72.     Bankruptcy Code § 363(m) affords protection to a good faith purchaser in any interest in property purchased from an estate, whether the sale conducted is later reversed or modified on appeal. Specifically, Bankruptcy Code § 363(m) provides as follows:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m). See Allstate Ins. Co. v. Hughes, 174 B.R. 884, 888 (Bankr. S.D.N.Y. 1994) ("Section 363(m) . . . provides that good faith transfers of property will not be affected by the reversal or modification on appeal of an unstayed order, whether or not the transferee knew of the pendency of the appeal."); In re Stein & Day, Inc., 113 B.R. 157, 162 (Bankr. S.D.N.Y. 1990) ("good faith purchasers are protected from the reversal of a sale on appeal unless there is a stay pending appeal").

73.     The Second Circuit Court of Appeals has held that a party would have to show fraud or collusion between a buyer and the debtor-in-possession or trustee in order to demonstrate a lack of good faith. See Kabro Assocs. of West Islip, LLC v. Colony Hill Assocs. (In re Colony Hill Assocs.), 111 F. 3d 269, 276 (2d Cir. 1997) (citations omitted) ("[t]ypically the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders."). See also In re Bakalis, 220 B.R. 525, 537 (Bankr. E.D.N.Y. 1998).

74.     Here, Maler Group is unrelated to the Debtors and the Trustee, has negotiated at arm's-length through an independent process and should be afforded good faith purchaser status under Bankruptcy Code § 363(m) if it is the successful purchaser for the CONs.

D.     **The Trustee Should Be Granted Related Relief**

75.     Pursuant to Bankruptcy Rule 6004(h), all orders authorizing the sale of property pursuant to Bankruptcy Code § 363 are automatically stayed for fourteen (14) days after entry of the order, unless otherwise ordered by the Court. FED. R. BANKR. P. 6004(h). The stay period is intended to provide sufficient time for an objecting party to appeal before the order is implemented. See Advisory Committee Notes to FED. R. BANKR. P. 6004(h).

76.     Although little guidance is provided by either Bankruptcy Rule 6004(h) or the Advisory Committee Notes as to when a court should "order otherwise", it has been suggested that the 14-day stay period should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to the procedure." See 10 COLLIER ON BANKRUPTCY § 6004.09 (Lawrence P. King, et al. eds, 15th ed. rev. rel. 2003). Colliers also proposes that if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to seek a stay pending such appeal. Id.

77.     Here, the Trustee respectfully requests that the Court waive the 14-day stay period required under Bankruptcy Rule 6004(h). This relief is both necessary and appropriate under the circumstances of this case given the nature of the assets to be sold and the proposed Notice of Sale procedures set forth herein. Indeed, in the event the Motion is approved, the Trustee intends to proceed with the CONs Sale on June 28, 2016.

78.     Pursuant to the M-383 Order, the Trustee is required to highlight any "extraordinary provisions" in a separate section of a motion seeking to sell estate assets. The

Trustee submits that there are no "extraordinary provisions" with respect to the proposed CONs Sale that have not otherwise been highlighted herein.

## NOTICE AND NO PRIOR REQUEST

79.     By separate application, the Trustee will seek the entry of an Order scheduling a hearing on shortened and limited notice of this Motion.

80.     No previous request for the relief sought herein has been made by the Trustee to this or any other Court.

**WHEREFORE** the Trustee respectfully requests that the Court grant the relief requested herein and such other and further relief as it deems just and proper.

Dated: May 19, 2016
Wantagh, New York                    **LaMONICA HERBST & MANISCALCO, LLP**
Counsel to Salvatore LaMonica, as Trustee

By:     _s/ Gary F. Herbst_
Gary F. Herbst, Esq.
Holly R. Holecek, Esq.
3305 Jerusalem Avenue, Suite 201
Wantagh, New York 11793
Telephone: (516) 826-6500