**PERKINS THOMPSON, P.A.**
One Canal Plaza, 9th Floor
PO Box 426
Portland, ME 04112
(207) 774-2635
Randy J. Creswell, Esq.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

| | |
|---|---|
| In re: ) | |
| ) | |
| TRANSCARE CORPORATION, <u>et al.</u>, ) | Chapter 7 |
| ) | Case No.: 16-10407 (SMB) |
| Debtors. ) | (Jointly Administered) |
| ) | |

---

**MOTION OF PATRIARCH PARTNERS AGENCY SERVICES, LLC TO COMPEL TURNOVER OF PROCEEDS FROM THE SALE OF CERTAIN PRSONAL PROPERTY**

TO THE HONORABLE STUART M. BERNSTEIN,
UNITED STATES BANKRUPTCY JUDGE

Patriarch Partners Agency Services, LLC ("PPAS"), by and through its undersigned counsel, hereby files this Motion to Compel Turnover of Proceeds from the Sale of Certain Personal Property (the "Motion"). PPAS seeks the entry of an Order, pursuant to §§ 105(a) and 704(a)(1) and (2) of the United States Code (the "Bankruptcy Code"), requiring the Trustee to comply with the plain terms of the Stipulation[1] and this Court's order approving the same dated March 25, 2016 (DE 52) (the "Order"). Specifically, PPAS requests that the Court order the

---

[1] On March 10, 2016, the Trustee, PPAS, and Transcendence Transit, Inc. ("Transcendence") entered a Stipulation Respecting the Sale of Certain Personal Property (the "Stipulation") which provided for, *inter alia*, the sale of the Foreclosed Personal Property Assets (as such term is defined therein). A copy of the Stipulation is attached as Exhibit A to the Order approving same, a copy of which Order is attached hereto as Exhibit A. Capitalized terms used and not defined herein have the meanings given to them in the Stipulation.

{P1223803.3}

Trustee to immediately (1) segregate $350,000 from the proceeds from the sale of the Foreclosed Personal Property Assets as sufficient to satisfy the Carve Out, subject to a full accounting,[2] and (2) turn over to PPAS the full balance of its unpaid portion of the net proceeds from the sale of the Foreclosed Personal Property Assets, as the parties agreed in the Stipulation and as the Order requires, which unpaid portion as of the date of filing of this Motion PPAS asserts is not less than $503,788. In support of this Motion, PPAS states as follows.

## JURISDICTION AND VENUE

1. This Court has jurisdiction over this Motion pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (B), (N), and (O). Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND

**A. The Bankruptcy Case**

2. On February 24, 2016, the Debtors[3] filed voluntary petitions for relief under chapter 7 of the Bankruptcy Code in this Court.

3. On February 25, 2016, Salvatore LaMonica was appointed as the interim Chapter 7 Trustee (the "Trustee") in each of the Debtors' cases.

4. By Order of this Court dated March 1, 2016, the Debtors' cases are being jointly administered (DE 17).

---

[2] PPAS hereby reserves all rights as to the amount, reasonableness and validity of any and all expenses purported to comprise the "Carve Out."

[3] "Debtors" is defined as TransCare Corporation, TC Ambulance Group, Inc., TC Ambulance North, Inc., TC Billing and Services Corp., TCBA Ambulance, Inc., TransCare Harford County, Inc., TransCare Management Services, Inc., TransCare Maryland, Inc., TransCare ML, Inc., TransCare New York, Inc., and TransCare Westchester, Inc.

**B.     The Stipulation**

5.     On March 10, 2016, the Trustee, PPAS, and Transcendence entered into the Stipulation.

6.     From March 1 to March 9, 2016, the Trustee, PPAS, and Transcendence engaged in extensive negotiations over the terms of the Stipulation. During those negotiations, as is reflected in the many messages and communications between the parties during that time, PPAS repeatedly made clear to the Trustee that the immediate payment to PPAS of its portion of the net proceeds from the sale of the Foreclosed Personal Property Assets was an essential and substantively critical aspect of PPAS's willingness to agree to the liquidation of the Foreclosed Personal Property Assets through the bankruptcy process.[4]

7.     Under the Stipulation, PPAS agreed that the following costs and expenses would be carved out and paid from the gross proceeds from the sale of the Foreclosed Personal Property Assets (the "Carve Out"):

> … sums sufficient to satisfy, in full, any and all <u>reasonable costs incurred by the Trustee directly in connection</u> with the preservation and protection of the Foreclosed Personal Property Assets until the commencement of the auction for such assets; (b) sums sufficient to satisfy, in full, any and all <u>reasonable</u> costs incurred by the Trustee in connection with the sale of the Foreclosed Personal Property Assets, <u>and as such costs relate specifically and solely</u> to the Foreclosed Personal Property Assets …

Stipulation ¶ 2 (emphasis added).

---

[4] For example, on March 3, PPAS, through counsel, informed the Trustee that, among other material terms, the Stipulation for the sale of the Foreclosed Personal Property Assets would require immediate payment to PPAS following the conclusions of the auctions and the cost-estimation and segregation process. On March 4, PPAS's counsel sent specific and material terms of the draft Stipulation to the Trustee's counsel for review and approval, and received only two minor revisions to the document, neither of which altered the substantive understanding of the parties with respect to the limited extent of the expenses potentially applicable to the Foreclosed Personal Property Assets and the immediate timing of distribution the net sale proceeds. On March 7, PPAS's counsel delivered to Trustee's counsel what in substance became the current and executed version of the Stipulation. That version specifically and plainly incorporated PPAS's most significant points concerning the *immediate* distribution of the net

8. Under the Stipulation, the Trustee agreed to pay to PPAS its portion of the net sale proceeds of the Foreclosed Personal Property Assets immediately after the gross proceeds had cleared and sufficient funds to satisfy the Carve Out had been segregated:

> <u>Upon the clearance</u> of the gross proceeds from the sale of the Foreclosed Personal Property Assets, <u>and following the segregation of sums sufficient to</u> satisfy the expenses set forth in ¶ 2(a) and (b) herein: 20% of the net proceeds from the sale of the Foreclosed Personal Property Assets will be carved-out for the benefit of the Debtors' estates . . .; and (b) <u>the Trustee</u> shall be authorized <u>to immediately pay</u> to PPAS 80% of the net sale proceeds from the sale of the Foreclosed Personal Property Assets, and <u>shall in fact immediately pay to PPAS such sums</u>, without further Order of the Court.

Stipulation ¶ 3 (emphasis added).

**C.  The Order**

9. By motion dated March 17, 2016 (DE 37), the Trustee sought, *inter alia*, approval of the Stipulation and authorization to proceed with public auction sales of Tangible Personal Property Assets (as such term is defined therein).

10. In the Order dated March 25, 2016, the Court approved the Stipulation.

11. The Order requires the Trustee to follow the directives in the Stipulation. *See* Order ¶¶ 3 and 4. The language in the Order requiring the Trustee to pay to PPAS its portion of the net sale proceeds of the Foreclosed Personal Property Assets immediately after the gross proceeds had cleared and the Trustee segregated sufficient funds to satisfy the Carve Out substantially mirrors the corresponding language in the Stipulation.[5]

---

sale proceeds, the reasonableness of any expenses associated with the sale of the collateral, and necessity that any such expenses relate specifically to the preservation, protection, and sale of that collateral.

[5] The Order stated that, in accordance with the Stipulation, the "following costs and expenses shall be carved-out of and paid from the gross proceeds from the sale of the Foreclosed Personal Property Assets (the "Carve Out"): (a) sums sufficient to satisfy, in full, any and all reasonable costs incurred by the Trustee directly in connection with the preservation and protection of the Foreclosed Personal Property Assets until the commencement of the auction for such assets; (b) sums sufficient to satisfy, in full, any and all reasonable costs incurred by the Trustee in connection with the sale of the Foreclosed Personal Property Assets, and as such costs relate specifically and solely to the

**D. Sale of the Tangible Personal Property Assets**

12. Pursuant to the Order, the Trustee retained Maltz Auctions, Inc. as his auctioneer to conduct the auction sales of Tangible Personal Property Assets (the "Auction Sales").[6]

13. Based upon information provided by the Trustee's office, and the Auctioneer's Report of Commission and Expenses for the Auction Sales of the Assets Conducted on April 20th, May 4th, May 6th, May 11th, & May 12th, 2016 (DE 257) and the Auctioneer's Report of Commission and Expenses for the Auction Sale of the Assets Conducted on June 21, 2016 (DE 258), both filed August 23, 2016 by Maltz Auctions Inc., the total gross sale proceeds from the Auction Sales conducted pursuant to the Order totaled $2,354,435.45.

14. PPAS understands that, from this $2,354,435.45, the Trustee turned over $303,516.73 to Kin Leasing Corp. ("Kin") purportedly on account of vehicles owned by Kin, and held back an amount of $71,183.27 subject to allocation between Debtors' estates and Kin, all pursuant to a Stipulation and Order dated April 8, 2016 (DE 78) (the "Kin Stipulation"). Assuming these amounts ($374,700 in the aggregate) have been validly turned over and held back by the Trustee under the Kin Stipulation,[7] PPAS believes this leaves $1,979,735 in gross

---

Foreclosed Personal Property Assets . . . ." Order ¶ 3. The Court also ordered, in accordance with the Stipulation, that "upon clearance of the gross proceeds from the sale of the Foreclosed Personal Property Assets, and following the segregation of sums sufficient to satisfy the Carve Out, 20% of the net proceeds from the sale of the Foreclosed Personal Property Assets will be carved-out for the benefit of the Debtors' estates (the "Creditor Carve Out"); and (b) the Trustee shall be authorized to immediately pay to PPAS 80% of the net sale proceeds from the sale of the Foreclosed Personal Property Assets without further Order of the Court." Order ¶ 4.

[6] Maltz Auctions, Inc. conducted the Auction Sales on the following dates and at the following addresses: (a) on April 20, 2016 at 25 14th Street, Brooklyn, New York 11215; (b) on May 4, 2016 at 718 South Fulton Avenue, Mt. Vernon, New York 10550; (c) on May 6, 2016 at 10 South White Street, Poughkeepsie, New York 12601; (d) on May 11, 2016 at 400 Seco Road, Monroeville, Pennsylvania 15146; (e) on May 12, 2016 at 1125 Desoto Road, Baltimore, Maryland 21223; and (f) on June 21, 2016 at 39 Windsor Place, Central Islip, New York 11722.

[7] PPAS has reserved all rights as to these amounts and validity of same.

proceeds attributable to the assets foreclosed-upon by PPAS on behalf of the secured lenders (the "PPAS Assets").

15. In the months following the Auction Sales, PPAS repeatedly requested that the Trustee pay PPAS the full balance of its portion of the net proceeds derived from the sale of the PPAS Assets as the Stipulation and Order require. During this time, PPAS was not made aware of any segregation of any amount on account of the Carve Out.

16. On or around July 15, 2016, almost three months after the first Auction Sale, the Trustee made a partial payment from the Auction Sale proceeds in the amount of $600,000.00 to PPAS in furtherance of the Stipulation and Order (the "July Payment"). As discussed in detail below, this payment represented only a portion of the net proceeds from the sale of the Foreclosed Personal Property Assets to which PPAS is entitled.

17. As no further distributions were made after the July Payment, on September 1, 2016, PPAS made a written demand for payment of the remaining amounts owed to it. In that regard, PPAS, through counsel, sent Trustee's counsel a letter, dated September 1, 2016 (the "Demand Letter") carefully setting forth and detailing its demand for receipt of the remaining funds. A copy of the Demand Letter is attached hereto as Exhibit B.

18. The Demand Letter stated that, as of the date of the letter, more than four months had passed since the first Auction Sale, and that PPAS had been paid less than half of the amount to which it was *immediately* entitled. PPAS's belief, based on the information made available by the Trustee and certain assumptions outlined in the letter, was that it was entitled to an amount not less than $1.3 million, of which $703,788 then remained unpaid. PPAS's calculations and assumptions for its $703,788 demand were laid out in a table in the Demand Letter. *See* Demand Letter, Ex. B, at 2-3.

19. The Demand Letter further noted, among other things, that no further distributions had been made since the July Payment. *Id.* at 3.

20. The Demand Letter further stated that the Trustee had "not provided a single reason for his delay that can be justified under the terms of the Stipulation and Order or in light of spirit of the parties' understanding and agreement at the time the Stipulation was entered into." *Id*.

21. The Demand Letter then outlined the reasons PPAS believed that the Trustee was not justified in releasing additional funds. *See id.* at 3-4.

22. Finally, the Demand Letter stated that PPAS now believed that it had no choice but to demand immediate payment of not less than $703,788, all as required by the Stipulation and Order. *Id.* at 4.

23. On or around September 14, 2016, the Trustee made a second partial payment to PPAS in the amount of $200,000.00 purportedly in accordance with the Order (the "September Payment").

24. After consideration of the September Payment, PPAS's updated accounting for the unpaid portion that is immediately payable is as follows:

| | |
|---|---:|
| Gross sale proceeds from auctions | $2,354,435 |
| *Less*: Maximum amount attributable to the Kin Stipulation[8] | ($374,700) |
| **Minimum *gross* proceeds attributable to PPAS assets** | **$1,979,735** |
| *Less*: Carve Out expenses (conservative estimate)[9] | ($350,000) |
| **Minimum *net* proceeds attributable to PPAS assets** | **$1,629,735** |
| **80% allocable to PPAS** | **1,303,788** |
| *Less*: July Payment | ($600,000) |
| *Less*: September Payment | ($200,000) |
| **Minimum balance immediately due to PPAS** | **$503,788** |

25. PPAS is prepared to work with the Trustee to provide whatever information is available and required in order to finally determine the amounts due to PPAS. However, given the length of the delay (i.e., over five months from the close of the last Auction Sale) and failure to date of the Trustee to finally turn over to PPAS the balance of what PPAS was *immediately* owed under the terms of the Stipulation and Order (to which terms the Trustee expressly agreed), PPAS is seeking this Court's assistance to compel the Trustee's compliance with same.

26. Accordingly, PPAS respectfully requests that this Court grant the relief sought herein.

---

[8] As noted in the Demand Letter, PPAS has deducted these amounts out of conservatism for purposes of these calculations, but reserves all rights as to the amount and validity of any and all such deductions.

[9] As noted in the Demand Letter, while PPAS deducts such estimate out of conservatism for these purposes (it is difficult to imagine the "reasonable" costs directly associated with the sale of the collateral being any greater than this figure, as that is approaching 20% of the collateral's total liquidated value), PPAS reserves all rights as to the amount and validity of any and all deductions asserted by the Trustee.

# DISCUSSION

**A. The plain and unambiguous terms of the Stipulation and Order require the Trustee to immediately pay to PPAS the balance of its portion of the net proceeds from the sale of the Foreclosed Personal Property Assets**

27. The Stipulation and Order are binding and enforceable. *See Hirsch v. Qingdao Orien Commercial Equip. Co., Ltd.*, 12-CV-952 RRM, 2015 WL 1014352, at *7 (E.D.N.Y. Mar. 6, 2015) (stating "'[S]tipulations and orders are binding agreements, that are enforceable just as contracts are.' *Hoblock v. Albany County Bd. of Elections,* 488 F.Supp.2d 163, 165–66 (N.D.N.Y.2006) . . . . That the stipulation became effective only upon judicial approval does not lessen this conclusion. *See Stein and Day Inc. v. Coordinated Systems and Services Corp.,* 83 B.R. 221, 226 (Bankr.S.D.N.Y.1988) (noting that a so-ordered stipulation 'has a double aspect both as a contract and as a court order') (citations omitted).").

28. The Stipulation and Order should be enforced according to their plain and unambiguous terms. *Id.* (stating "'[T]he fundamental, neutral precept of contract interpretation is that agreements are construed in accord with the parties' intent,' and that the 'best evidence of what parties to a written agreement intend is what they say in their writing.'. . . As a result, '[w]hen parties set down their agreement in a clear, complete document, their writing should as a rule be enforced according to its terms.' *In re AMR Corp.,* 730 F.3d 88, 98 (2d Cir.2013) (quoting *W.W.W. Assocs., Inc. v. Giancontieri,* 77 N.Y.2d 157, 162, 565 N.Y.S.2d 440, 566 N.E.2d 639 (1990)) (quotations omitted)."). "[W]hen the terms of an agreement are unambiguous, a court is obligated to enforce the language as written, and must avoid the temptation to 'make a new contract for the parties under the guise of interpreting the writing.'" *Id.* at *8 (citation omitted).

29. As set forth in the Demand Letter, under the plain and unambiguous terms of the Stipulation and Order, there were only two pre-conditions to the immediate payment to PPAS of its portion of the net proceeds from the sale of the Foreclosed Personal Property Assets, namely, (a) "clearance" of the gross proceeds, and (b) the segregation of sums sufficient to satisfy the Carve Out. *See* Stipulation ¶ 3 and Order ¶¶ 3-4. The first pre-condition has been satisfied as there can be no question that the gross proceeds have cleared.

30. As to the second pre-condition, the Trustee has not provided *any* indication that he has taken any steps to segregate funds in compliance with the Stipulation and Order. Holding back the balance of the proceeds cannot and does not constitute segregation.

31. Further, to the extent that the Trustee refuses to distribute PPAS's remaining balance on the basis that he intends to first resolve and pay other and unrelated administrative expense claims from these funds, this contravenes the express terms of both the Stipulation and Order (in particular, paragraph 3 of the Stipulation, paragraph 4 of the Order, and the definition of "Carve Out"). Nothing in the Stipulation or Order obligates, requires, mandates or otherwise directs or allows for PPAS's proceeds to be held to account for unrelated administrative expense claims of the estates. *In re Flagstaff Foodservice Corp.*, 762 F.2d 10, 12 (2d Cir. 1985) ("A secured creditor's consent to the payment of designated expenses limited in amount will not be read as a blanket consent to being charged with additional administrative expenses not included in the consent agreement. *See In re West Post Road Properties Corp.,* 44 B.R. 244, 247-48 (Bkrtcy.S.D.N.Y.1984); *In re Roamer Linen Supply, Inc.,* 30 B.R. 932, 936 (Bkrtcy.S.D.N.Y.1983)."). Simply put, the Trustee is not justified, under the plain and unambiguous terms of the Stipulation and Order or otherwise, to continue to delay distribution to PPAS of any of its proceeds.

32. Even if the Stipulation and Order were somehow ambiguous, extrinsic evidence from the parties' negotiations over the terms of the Stipulation show that PPAS made clear to the Trustee that immediate payment to PPAS of its portion of the net sale proceeds was an essential and critical *sine que non* to PPAS's willingness to agree to the sale of the Foreclosed Personal Property Assets through the bankruptcy process. *See Hirsch*, 2015 WL 1014352, at *7 (stating "if a written agreement is 'ambiguous,' the parole evidence rule allows for the consideration of extrinsic evidence to shed light on the parties' underlying intent.").

33. For example, on or about March 3, 2016, PPAS's counsel specifically informed the Trustee's counsel that, among other material terms, any agreement for the sale of the assets would require a direct payment to PPAS of the proceeds attributable to the Foreclosed Personal Property Assets upon closing (i.e., with payments not going through the Trustee or the Debtors' estates, but directly to PPAS). After Trustee's counsel expressed his reservations about such a direct payment mechanism, PPAS's counsel agreed that payments could go through the Trustee, but *only* if payment of PPAS's portion was *immediate* and with no holdback. Trustee's counsel agreed. The Trustee's delay and failure to pay the full amount owed to PPAS violates the spirt of the parties' understanding and intent when they agreed to the Stipulation.

34. To date, through the July Payment and September Payment the Trustee has only paid PPAS a portion of the amount to which it is entitled under the terms of the Stipulation and Order. PPAS asserts that it is entitled to immediate payment of the full amount due and outstanding under the Stipulation and Order.

**B. The Trustee has no basis under the Bankruptcy Code to hold PPAS's portion of the net sale proceeds to account for administrative expenses**

35. The Trustee's refusal to distribute PPAS's remaining balance of its portion of the net proceeds from the sale of the Foreclosed Personal Property Assets not only contravenes the Stipulation and Sale Procures Order, but also the Bankruptcy Code. Nothing in the Bankruptcy Code (11 U.S.C. § 506(c), in particular) obligates, requires, mandates or otherwise directs or allows for PPAS's proceeds to be held to account for administrative expense claims of the estates.

36. To the extent that the Trustee has refused to distribute PPAS's remaining balance because he intends to first resolve and pay other and unrelated administrative expense claims from these funds, the Trustee lacks any basis under the Stipulation and § 506(c) to do so. *See In re Summit Ventures, Inc.*, 135 B.R. 478, 483 (Bankr. D. Vt. 1991) ("To prevail under § 506(c), a trustee must establish the following elements: (1) the purpose for the costs and expenses is necessary to preserve or dispose the collateral; (2) the costs and expenses are reasonable as measured against the amount of costs and expenses that would have been incurred by the holder of a secured claim in the property; and, (3) the extent of any direct benefit to the holder of the secured claim."). *See also In re Nat'l Enter. Wire Co., Inc.*, 103 B.R. 56, 60 (Bankr. N.D.N.Y. 1989) (stating that even where a secured creditor consents to certain expenses for the preservation and sale of its collateral, "the trustee bears the burden of proving the applicability of Code § 506(c), . . . and that it is not a substitute for the recapture of ordinary administrative expenses normally the obligation of the debtor's estate.") (citation omitted); *In re Flagstaff Foodservice Corp.*, 762 F.2d at 12 ("A debtor does not meet this burden of proof by suggesting possible or hypothetical benefits.") (citation omitted).

### C. The Trustee is not permitted to segregate any amount other than what is "sufficient to satisfy the Carve Out"

37. Finally, to the extent that the Trustee is holding back distribution of PPAS's unpaid portion on account of amounts that do not meet the agreed-upon definition of "Carve Out," he is not entitled to do so.

38. First, as noted above, merely holding back funds cannot and does not constitute segregation.

39. Second, the Trustee needs to show that, to the extent he has in fact segregated any of the Auction Sales proceeds on account of expenses (which is not clear to PPAS), those segregated funds are solely amounts "sufficient to satisfy Carve Out expenses."

40. As noted above, "Carve Out," as defined, only encompasses:

> … sums sufficient to satisfy, in full, any and all <u>reasonable costs incurred by the Trustee directly in connection</u> with the preservation and protection of the Foreclosed Personal Property Assets until the commencement of the auction for such assets; (b) sums sufficient to satisfy, in full, any and all <u>reasonable</u> costs incurred by the Trustee in connection with the sale of the Foreclosed Personal Property Assets, <u>and as such costs relate specifically and solely</u> to the Foreclosed Personal Property Assets …

Stipulation ¶ 2 (emphasis added). See also Order at ¶ 3.

41. Thus, any and all amounts segregated must be on account of (i) *reasonable* costs incurred by the Trustee *directly* in connection with *preserving and protecting the PPAS assets* before the first Auction Sale, or (ii) *reasonable* costs incurred by Trustee in connection with the *sale of PPAS assets*, as such costs *relate specifically and solely to the PPAS assets*. Amounts that do not fall within the parameters of this definition cannot be included in the segregation.

42. Holding back amounts that exceed an amount sufficient to satisfy the foregoing definition of "Carve Out" is not permitted under the Stipulation and Order, and PPAS reserves all rights as to any amounts the Trustee intends to assert does satisfy such definition. Moreover,

such holdback does not justify continuing to delay paying the balance of what is due and owing to PPAS under the agreed-upon terms of the Stipulation and Order.

## **CONCLUSION**

WHEREFORE, PPAS requests that the Court: (i) order the Trustee to comply with the plain terms of the Stipulation and the Order approving the same, and immediately (a) segregate $350,000 from the proceeds from the sale of the Foreclosed Personal Property Assets as sufficient to satisfy the Carve Out, subject to a full accounting, and (b) turn over to PPAS the full balance of its unpaid portion of the net proceeds from the sale of the Foreclosed Personal Property Assets, as the parties agreed in the Stipulation and as the Order requires, which unpaid portion as of the date of filing of this Motion PPAS asserts is not less than $503,788; and (ii) grant PPAS such other and further relief as may be appropriate under the circumstances.

Dated at Portland, Maine this 3rd day of October, 2016.

/s/ Randy J. Creswell
Randy J. Creswell, Esq.
Counsel for Patriarch Partners
Agency Services, LLC

Perkins Thompson, P.A.
One Canal Plaza, PO Box 426
Portland, ME 04112-0426
(207) 774-2635
rcreswell@perkinsthompson.com